[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff, Housing Authority of the City of Danbury (hereinafter Housing Authority), in the above entitled action has made an application for a temporary injunction against the defendants. The State of Connecticut, acting through an interagency task force comprised of the Connecticut State Departments of Human Resources, Mental Health, Housing, Connecticut Alcohol and Drug Abuse Commission and the Connecticut Housing Finance Authority, which interagency task force is chaired by the Commissioner of the Department of Human Resources is the first named defendant herein (hereinafter State). The second defendant, Corporation for Supportive Housing (hereinafter CSH), is a nonprofit, foreign corporation with a principal place of business at 342 Madison Avenue, New York, New York.
On August 16, 1993, the defendant State moved to dismiss the action on the ground that the court lacked subject matter jurisdiction, pursuant to Practice Book 142, 143(1) and 145. The defendant State essentially claims that the plaintiff has attempted to appeal from an administrative decision that is not from a contested case and further claims that the plaintiff is not an aggrieved party. The second named defendant, CSH, has joined in the motion to dismiss.
The plaintiff is represented by Attorney Steven Smart. The defendant State is represented by Maite Barainca, Assistant Attorney General. The defendant CSH is represented by Attorney P. Gilson.
On September 30, 1993, the Superior Court (Moraghan, J.) issued a memorandum of decision which denied the motion to dismiss CT Page 2973 filed by the State and also ordered an evidentiary hearing in order to determine whether or not the plaintiff has standing to seek injunctive relief as prayed for in its verified complaint and its application for a temporary injunction. Relying heavily upon Unisys Corp. v. Department of Labor, 220 Conn. 689, the trial court (Moraghan, J.) did not rule on the question of standing although the court did deny the defendant's motion to dismiss based upon the sovereign immunity of this state and also based upon the claim that the plaintiff has attempted to appeal from an administrative decision that is non a contested case.
Consequently, this court conducted an evidentiary hearing on January 11, 12 and 13, 1994. Based upon the credible testimony presented at the hearing and also after a review of the exhibits and the claims made by the parties and their arguments, the court finds the following:
1. The defendant State is compromised of the Connecticut State Departments of Human Resources, Mental Health, Housing, Connecticut Alcohol and Drug Abuse Commission and the Connecticut Housing Finance Authority (hereinafter the "interagency task force"). The interagency task force and CSH issued in early 1993 a request for qualifications (hereinafter "RFQ") seeking submissions for qualifications from not-for-profit organizations interested in participating in the Connecticut Supportive Housing demonstration program (hereinafter "demonstration program").
2. The defendants actively solicited participation from agencies such as the plaintiff for the demonstration program. Said program involves developing and managing housing and providing services to homeless, at risk and low income persons.
3. The interagency task force chaired by the Commissioner of Human Resources designated a task force working group (hereinafter "working group") in order to act as a review committee. Its function was to design the model for the demonstration program, formulate the RFQ, solicit applications in response to the RFQ, review the applications, conduct site visits to applicants and recommend to the interagency task force applicants for participation in the demonstration program.
4. From the inception of the working group until July 1, 1993, CT Page 2974 the chairman of the interagency task force (Human Services Commissioner) designated Joseph K. Kane as chairman of the working group.
5. The RFQ is an application process created by the State of Connecticut's interagency task force and consisting of an application packet (plaintiff's exhibit 3) and an information packet (plaintiff's exhibit 4).
6. Section VII(11) of the RFQ (plaintiff's exhibit 4) states:
 "Collusion: By responding, an organization implicitly states that the proposal is not made in connection with any competing organization submitting a separate response to the RFQ, and is in all respects fair and without collusion or fraud. It is further implied that the organization did not participate in the RFQ development process, had no knowledge of the specific contents of the RFQ prior to its issuance, and that no employee of the agencies comprising the interagency task force participated directly or indirectly in the organization's proposal preparation." [Emphasis added.]
7. Deputy Commissioner Melodie Pett, Peter Johnson and Lynn Aronson were agents and employees of the defendant State. They were also members of the interagency task force and represented the Department of Mental Health.
8. Mr. Peter Johnson and Ms. Lynn Aronson requested that Mr. Bernard Fitzpatrick, Executive Director of the plaintiff Housing Authority prepare an application in response to the RFQ on behalf of the Housing Authority. Mr. Peter Johnson and Ms. Lynn Aronson decided to and did in fact approach Mr. Fitzpatrick in order to participate in the RFQ development process notwithstanding the provisions contained in Section VII(11) of the RFQ information packet (plaintiff's exhibit 4).
9. As a result of the intervention by Ms. Aronson and Mr. Johnson, Mr. Fitzpatrick altered his initial RFQ. Both CT Page 2975 Johnson and Aronson are employees of the Department of Mental Health and Aronson was also a member of the working group of the interagency task force.
10. Mr. Fitzpatrick was aware of the conflict as was Ms. Aronson and Mr. Johnson at the time that these individuals met to discuss the Housing Authority's modification of the RFQ.
11. As a result of the meeting by Aronson, Johnson and Fitzpatrick, the plaintiff Housing Authority's proposal was changed or altered in order to include twelve to twenty geriatric patients from the Fairfield Hills Hospital, an institution which is under the Department of Mental Health. Mr. Fitzpatrick was left with the impression that this change would enhance the plaintiff Housing Authority's application. Mr. Fitzpatrick disclosed, in plaintiff's exhibit 15, that the State of Connecticut's Department of Mental Health participated in the application although it was not a joint applicant in the application.
12. The application (plaintiff's exhibit 15) proposed seventy units for one bedroom housing to include twenty geriatric, mentally ill persons, seven nongeriatric, mentally ill persons, eight HIV positive persons and thirty-five homeless or homeless-at-risk persons. Plaintiff's application includes a representation from Peter Johnson to Bernard Fitzpatrick suggesting the commitment of his agency and of Fairfield Hills Hospital to provide staff and other ancillary support to serve the twenty elderly persons with psychiatric impairments who would live at the site which would be developed by the plaintiff from the CSH funds.
13. As a result of the discussions, representations and interfacing between members of the Department of Mental Health (Aronson and Johnson), the plaintiff altered its initial application from thirty units to seventy units because the defendant State had requested that the plaintiff include twenty additional slots for geriatric patients along with a matching grant for special needs and non-special needs of an additional twenty units for a total of forty units in addition to the original thirty units.
14. The working group reviewed applications and conducted a site visit to discuss the plaintiff's application in more detail. CT Page 2976
15. On May 4, 1993, two members of the working group (Janice Elliot for the defendant CSH and Joseph Kane for the defendant State) made a site visit to Danbury. The working group members expressed concern about the size of the plaintiff's application as well as the tenancy mixture and support services for individuals without special needs.
16. On May 7, 1993, the working group made a final review of the applications and recommended ten applicants for participation in the demonstration project excluding the plaintiff from participation in the demonstration program.
17. On May 24, 1993, the Commission of Human Resources conveyed to the interagency task force the recommendations of the working group without any alteration. These were submitted to the task force for their approval.
18. The interagency task force relied exclusively upon the recommendations of its working group. The interagency task force approved all ten recommendations made by the working group after the working group considered twenty-eight applications. Plaintiff's RFQ was included among the eighteen rejected by the working group and, subsequently, by the interagency task force. Said rejection was set forth in a letter (plaintiff's exhibit 16) dated June 7, 1993.
Notwithstanding the above findings of fact, the court finds that the plaintiff Housing Authority has no standing to pursue its application for a temporary injunction. Although the plaintiff has demonstrated sufficient questions of fact to support its claim of collusion, it has failed to demonstrate the existence of any injury to the plaintiff within the application process.
Although judicial review of an administrative decision is generally governed by the Uniform Administrative Procedure Act ("UAPA"), absent some specific entitlement to judicial review, the plaintiff should ordinarily not be entitled to judicial review. However, because of the unique composition of the interagency task force and its relationship with the CSH, there is no other recourse but the courts for the plaintiff's to review any claim of misconduct, unfair consideration or violation of the standards created by the interagency task force itself.
Although it is apparent from the testimony at the hearing that the selection process under the demonstration program CT Page 2977 is not quite analogous to the competitive bidding process, in Spiniello Construction Co. v. Manchester, 189 Conn. 539 (1983), our Supreme Court held that "Courts will intervene . . . where fraud, corruption or favoritism has influenced the conduct of the bidding officials or when the very object and integrity of the competitive bidding process is defeated by the conduct of the . . . officials." (Emphasis added.) This principal was revisited in Unisys Corp. v. Department of Labor, 220 Conn. 689 (1991) case.
It is apparent to this court from the evidence presented at the hearing that the entire selection process is deficient since there is no statutory authority under which the program exists and operates with respect to the selection process. Although the evidentiary hearing did not produce evidence to demonstrate that any statute has been violated, the intervention, participation and interference of employees of the Department of Mental Health in the application of the Housing Authority involved acts which undermined the object and the integrity of the selection process in violation of the interagency's own regulations prohibiting collusion.
Also, although the defendants should be held to the conditions for selection which they themselves have articulated to applicants, the plaintiff has not demonstrated that it has a protectable legal interest that would give it standing. Absent that legal interest, the plaintiff would lack standing for a judicial review of this process and would be unable to seek an injunction enjoining the defendants from distributing funds or giving effect to any contract under the demonstration program.
It is a basic principal of law that a plaintiff must have standing in order for a court to have jurisdiction. Connecticut Business Industry Assoc., Inc. v. CHHC, 218 Conn. 335,345 (1991). Likewise, it is a traditional standing requirement that a party bringing suit must demonstrate a legal interest in the subject matter of a controversy. Further, the plaintiff claiming aggrievement must successfully establish that this legal interest has been specially and injuriously affected by the decision. Connecticut Business Industry Assoc., Inc. v. CHHC, 214 Conn. 726 at 730 (1990).
In order to have a legal interest which would give the plaintiff standing, the interest must be clearly protected by law. A business operation does not have a legally recognized interest in being free from competition. State Medical Society v. Board of CT Page 2978 Examiners in Podiatry, 203 Conn. 295 (1987). A legal interest must be within the zone of interest protected by a state statute or constitutional guarantee. See New England Rehabilitation Hospital of Hartford, Inc. v. CHHC, 226 Conn. 105 (1993).
Here the plaintiff has not demonstrated nor alleged a constitutional or statutory right that has been violated by the defendant's actions. The plaintiff has not demonstrated any legally protected interest which derives from some particular statute or constitutional provision.
The court finds that there is no contractual right that has been created by the RFQ process itself. The RFQ process explicitly stated that applicants had no entitlement to anything and that the very criteria under which the applicants were to be selected could change at the sole discretion of the state and Corporation for Supportive Housing. This was set forth in the RFQ information packet, Section 7, Conditions, p. 19 (plaintiff's exhibit 4). The RFQ stated:
 "(16) This request for qualifications does not represent any obligation or agreement whatsoever on the part of the state or of CHS, which may only be incurred or entered into by written agreement approved as necessary by the State Attorney General, the State Bond Commission, the Board of Directors of CHFA, or by an authorized officer of CSH."
 "(17) Neither the state nor CSH is obligated to pay, nor shall in fact pay, any costs or losses incurred by any applicant at any time including the cost of responding to this RFQ."
 "(19) The qualifications of an applicant will not create any rights on the applicant's part, including without limitation, rights of enforcement, equity or reimbursement, until all necessary documents are fully executed and approved by the appropriate state agencies or CSH's Board of Directors."
 "(21) The state and CSH reserve the right, at their sole discretion, to reject at any CT Page 2979 time, any or all proposals, to withdraw the RFQ, to negotiate with one or more applicants on terms other than these set forth herein. The state and CSH likewise reserve the right, at any time, to waive compliance with or change any of the terms and conditions of this RFQ."
Mr. Fitzpatrick, the plaintiff's executive director, testified that the plaintiff had suffered no monetary damages at all due to the state's decision not to include it in the housing demonstration project. There was no evidence offered as to any other type of legal injury.
The evidence in this case has failed to demonstrate that the Housing Administration Project is subject to the same process as the competitive bidding process. This court finds that the Housing Demonstration Project is not similar to the state's competitive bidding process since the court has already found that there is no legal interest nor legal injury resulting from or created within the Housing Demonstration process.
For the foregoing reasons, the defendants' motion to dismiss the action is hereby granted.
EDDIE RODRIGUEZ, JR., JUDGE